*Cotter,* amicus curiae.

## 29607. OWENS v. THE STATE.

UNDERCOFLER, Presiding Justice.

Loy Alton Owens was indicted by the grand jury in three counts for bigamy, incest and murder involving Scarlett Irene Owens. He was convicted of each crime and sentenced to serve ten years for bigamy, twenty years for incest, and life for murder.

The appellant abandoned all enumerations of error except one. This enumeration of error asserts that the trial court erred in denying his motion to sever the various counts of the indictment because bigamy, incest and murder are independent and separate crimes and in the interest of justice should not be tried jointly before a jury.

The state contended that the crimes were all inter-related, arose from the same continuing course of conduct, and were necessarily tried together.

The evidence shows that the defendant was married to Mrs. Frankie Owens in 1945. They had 4 children. The oldest was Scarlett Irene Owens, the murder victim, who was born on September 20, 1946.

Scarlett was a dedicated Christian and attended church until she was 15 or 16 years of age. However, the defendant would not let her go to church socials or other affairs where boys would be present. She left her parents' home and became pregnant. As a result her mother forced Nick Ribaudo to marry her in Florida on January 9, 1964. Ribaudo was a serviceman and Scarlett went to New York to live with his parents while he was overseas. She stayed there several months and then went to Tulsa, Oklahoma. In 1964 the defendant and Scarlett lived in an apartment in Tulsa together. The defendant knew that Scarlett was still married to Ribaudo. The apartment contained love letters between the defendant and Scarlett. There was only one bed in the apartment which was unmade and appeared to have been slept in by two persons. The sister of the victim and daughter of the defendant observed

them at a drive-in movie hugging and kissing and the defendant gave Scarlett some pills and told her they would make her feel better. In 1968 Scarlett told the sister that she really loved her husband Ribaudo and wanted to get away from the defendant but that she could not because she was "always having to take pills and things like that and every time she'd get off, she'd have to take more pills." She told her that she knew that she had done "wrong" and hoped that God would forgive her.

A justice of the peace testified that he married the defendant and Scarlett on April 22, 1969. In 1969 the defendant and Scarlett represented to two police officers that they were husband and wife. A written statement signed by Scarlett Owens Ribaudo was read into evidence. It stated that she was married and living with Ribaudo in New York when her father called and asked her to come to Tulsa, Oklahoma; that she got a job in Tulsa and stayed at a named residence; her father took her to his apartment and had sexual intercourse and also performed unnatural sexual acts with her for a period of four months before they moved to Atlanta; that he kept giving her drugs; that they lived together in Chattanooga as man and wife; and that he forced her to have sexual relations with other men for money.

On February 15, 1971, Glenn Perkins was painting at the trailer park in which the defendant and Scarlett had their trailer parked. The defendant requested him to obtain some cigarettes for him because he was too drunk to get them. He refused. Later that same day the defendant again asked him to get some cigarettes but again he refused. The witness was at the door of the trailer. He saw Scarlett, the victim, sitting on a sofa in the living room with her head down and blood coming from around her nose. Her eyes were open but she did not speak to him. The witness left the trailer to empty some trash and about five minutes later the trailer was almost totally consumed by fire. He saw the defendant outside the trailer with one shoe on and he was still drinking.

Arthur Franklin lived at the trailer park. He saw the defendant immediately after the fire. He told him to get cleaned up and go see about his wife. He asked him if he tried to get her out of the fire and he did not say anything

except that he got scared.

Ruby Arrington lived at the trailer park and was ironing in the trailer of a neighbor on the day of the fire. About 3:00 p.m. she was looking out a window of the trailer and saw the defendant falling or staggering outside his trailer door. He then went inside his trailer. He left the door open and she could see him a few minutes later walking back and forth several times in front of the open door with a torch or flame about waist high. Smoke was coming from the trailer when the defendant left it and he kicked a heater out of it. The witness ran toward the trailer, touched the heater, and found it was cold. The defendant went to the back of the trailer and leaned against it with his jacket over his head. She heard some grunting or "something like a baby" inside the trailer and tried to open the back door. When she was unable to open it, she asked the defendant to help her so they could get the baby out and he said there was no baby. She went around to the front door and saw the victim walking out. She was a flaming torch and the victim said, "My God, help me" two or three times. The victim fell. She tried to throw dirt on her to smother the flames and someone put a coat and a jacket over her. The defendant then pushed the witness out of the way and took the victim by the arms and dragged her down the road away from the fire.

The ambulance driver asked the defendant if he wanted to go to the hospital with his wife. He waived his hand, turned, and walked the other way.

Bobby Bryant, a fireman, testified that after the fire was extinguished, he went over to an area about 50 feet away and saw the defendant hovering over the victim covering her face "completely." He grabbed the defendant by the shoulders and raised him. He took a covering from the face of the victim and noticed that she was still alive. An ambulance was called. He asked the defendant if he wanted to go to the hospital and he replied, "Hell no, I don't want to go see about her. I am not concerned about her." The defendant's pants legs were rolled up and he saw burns on the defendant's legs. A Coleman lantern was outside the trailer.

Ron LeCroy, a policeman, saw the defendant braced against a tree when he arrived at the scene of the fire. The

defendant seemed to be drunk, his eyes were burned or bloodshot, he smelled of alcohol and his speech was slurred. The officer asked him if he wanted to go to the hospital with his wife. He stated that he did not and did not desire to go to the hospital to have his legs treated for the burns. The officer asked him what had happened and he told him to talk to his lawyer. The officer advised him of his rights.

Albert Lingerfelt, a detective, stated that he asked the defendant what had happened and the defendant told him to talk to his lawyer. He had no suspicion of the defendant at this time. The defendant then told him that the heater had exploded and he had thrown it out of the trailer. An investigation showed that the heater had not exploded and was cold to the touch. He took the defendant to the hospital to be treated for the burns above his knees. The defendant appeared to be intoxicated and said he had had some drinks.

Ed Barrett, the fire inspector and arson investigator, testified that the burned part of the lantern had melted and there was nothing at the site of the fire to indicate an explosion had taken place. The burn patterns on the floor of the trailer looked as if something had been poured on the floor and ignited. Three dogs burned in the fire.

Ernest Slighton, a toxicologist with the State Crime Laboratory, examined the blood of the victim. He counted approximately one miligram per cent of secobarbital in the blood of the victim and approximately fifteen to twenty per cent of carbon monoxide. The presence of carbon monoxide indicated that the person was alive before the fire started and inhaled the carbon monoxide.

Dr. Alan S. Cleeper, physician, testified that the amount of secobarbital in the blood of the victim would create a semicomatose state and make her difficult to arouse. He performed an autopsy on the victim and testified that the burn patterns on the body indicated that a flammable liquid had been poured or thrown over the body and ignited. These burns covered from eighty to ninety per cent of the body. The primary cause of death was smoke inhalation and the burns were a secondary cause. The victim had multiple bruises over her body which were inflicted one to three days prior to her death.

The fire insurance policy on the trailer would have expired on February 17, 1971. The fire occurred on February 15, 1971, and the defendant was paid $3,800 for the loss of the trailer. The defendant told the funeral director that he had a $2,000 insurance policy on the victim.

The defendant testified that he is a contract engineer. After he lost his job at an aircraft company, he drove a food truck. He testified that the trailer burned because of a Coleman lantern which shot flames from it. He stated he had filled the lantern with oil and took it back into the trailer; that he was heating water on the stove because the hot water heater was not working; and that the victim picked up the lantern and put it beside her. It was a cold, rainy day and they had no heat in the trailer; that the lantern was used for heat; and that they also had the kitchen stove and kerosene heater burning. The wick was almost burned out of the heater and it would not stay lit. He later threw it out of the trailer. When the victim told him of the fire, he took the boiling water from the stove to throw on the flames. He could not get the fire out with the water. He told the victim to get the poodle and get out of the trailer. He thought that she had. He ran back and forth inside the trailer trying to put the fire out and went to the door three times to breathe. When he saw his wife on the ground outside the trailer, he went out and tried to help her, and he put out the fire in her hair. He walked across the room of the trailer with the kerosene lantern in his hand. There was no explosion but a valve was leaking on the Coleman lantern. He had drunk three bottles of beer that day and had some medicine. He had been discharged from his employment and they were "going down" in their finances because they had taken a six months vacation in California. He stated that he was not the father of Scarlett but his brother was. His brother is now dead. He denied ever having sexual relations with the victim and testified that he did not sleep in the same bed with the victim except in sleeping bags on top of it. He stated that he only married the victim to give her identification; that the victim came to live with him in 1964, that she left in 1968 for about a year but came back; that they stayed in motels all over the country together;

and that he married her, held her out as his wife, but never had sexual relations with her. *Held:*

The only question presented for decision here is whether the trial court erred in requiring the appellant to be tried before the same jury on the separate offenses of bigamy, incest and murder over his objection.

Code Ann. § 26-506 provides: "(b) If the several crimes arising from the same conduct are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution except as provided in subsection (c). (c) When two or more crimes are charged as required by subsection (b), the court in the interest of justice may order that one or more of such charges be tried separately." Ga. L. 1968, pp. 1249, 1267.

The jury was authorized to find from the evidence that the defendant first committed the crime of incest in 1964 and that it continued until the time of the murder. The jury was authorized to find from the evidence that the defendant married the victim in 1969 when he had a living wife. As was stated by this court in *Henderson v. State,* 227 Ga. 68, 76 (179 SE2d 76): "From the nature of the entire transaction it would be almost impossible to present to a jury evidence of one of the crimes without also permitting evidence of the other crimes to be introduced since they were all a part of one continuous transaction covering a period of 18 to 20 hours."

*Henderson v. State,* p. 76, supra, also held: "The only test under the new Criminal Code is whether the interests of justice will be served by ordering separate trials. The judge may order the charges tried separately but he is not required to do so if in his opinion the interests of justice will not be served thereby. We think the trial court in this case was justified under the facts of the case in concluding that the interests of justice would not be served by ordering separate trials."

We find from the evidence presented in this case that the jury was authorized to find that the crimes of incest and bigamy culminated in the crime of murder. Under these facts the trial court was justified in concluding that the interests of justice would not be served by ordering separate trials. Compare *Pass v. State,* 227 Ga. 730 (3)

(182 SE2d 779); *Loftin v. State,* 230 Ga. 92 (1) (195 SE2d 402); and *Dingler v. State,* 233 Ga. 462 (211 SE2d 752).

*Judgment affirmed. All the Justices concur, except Gunter, Ingram and Hall, JJ., who dissent.*

ARGUED FEBRUARY 10, 1975 — DECIDED MARCH 4, 1975.

*Garland & Garland, Edward T. M. Garland, Harold Horne,* for appellant.

*George W. Darden, District Attorney, B. Wayne Phillips, Arthur K. Bolton, Attorney General, Lois F. Oakley,* for appellee.